Case No. 19-3051, et al., United States of America v. Antonio Moreno-Membache, appellants. Ms. Hernandez for the appellants, Mr. Pierce for the appellee. Good morning, Your Honor. Good morning. Good morning, Your Honor. May it please the Court, Carmen Hernandez arguing on behalf of Mr. Moreno, Antonio Moreno-Membache. Your Honor, as the Court is well aware, more than 97% of cases are resolved by plea agreement. And plea agreements have a constitutional component because a defendant waives multiple rights, constitutional rights to a trial, to confront witnesses, to have the government prove its case when he signs a plea agreement. In this case, the issue of the defendant's eligibility for the safety valve was a major issue in allowing Mr. Moreno-Membache to plead guilty. In fact, the government had wired the pleas, that is, the government had required that all three defendants plead at the same time or they would have had to go to trial. Mr. Moreno-Membache reluctantly agreed to plead guilty. The original plea agreement was aborted because he refused to plead guilty unless he could argue that he was eligible for the safety valve. A provision in the plea agreement states that the government would not seek any enhancements under Chapter 3 of the sentencing guidelines. In order to be eligible for the safety valve, a defendant cannot have an aggravating role in the offense. Chapter 3 is the section of the sentencing guidelines that includes aggravating roles. Now, the government seems to argue that they weren't below, that they did not seek an enhancement under Chapter 3, that they merely were arguing that they had role enhancements. But that misconstrues the application of the sentencing guidelines, which in order to be prohibited from eligibility from the safety valve, there has to be an enhancement under the role adjustment. It's not enough that someone be a leader or supervisor. If he doesn't get a Chapter 3B enhancement, he is eligible for the safety valve. It was clear everyone understood that this is what the plea agreement meant and intended. It's clear that it's a reasonable interpretation of the plea agreement. The government's argument on the plea agreement would invalidate or would give no meaning to the sentence in the plea agreement that said that the government would not seek an enhancement under Chapter 3. The argument that the later sentence that says the government could object to application of the safety valve somehow nullifies that earlier sentence makes no sense. Because you can challenge eligibility for the safety valve under the four other provisions of the safety valve. In order to be eligible for the safety valve, you have five requirements. One of them is aggravating role. So the government was free to argue against the safety valve, but not free to argue on the particular provision that said a role enhancement. The guideline sentence was well above the mandatory minimum. I think it was 262 to 327 months. That was not Mr. Moreno-Mimbache's contention. That's not what he argued below. Let me just spell this out and you can respond. So had the government sought a 3B enhancement, the range would have gone. Maybe I have the numbers wrong, but the range would have gone from something well over the 120-month mandatory minimum to would have been increased even more. And it could have gone up if they had gotten a plus-4 enhancement. It could have gone up all the way to life. So when the government made the commitment not to seek an upward 3B enhancement, that commitment still seems to be doing a lot of work. Even if the government is reserving all of its rights to argue that the sentence should not drop below the mandatory minimum based on the safety valve, based on any ground under the safety valve. Your Honor, that's not how you would interpret the plea agreement. The plea agreement was a C plea. That means the court had to impose the agreed-upon sentence to 120 months. So nothing the government argued at sentencing could increase the sentence above 10 years. It was a plea pursuant to Rule 11C1C of the Federal Rules of Criminal Procedure. So the only meaning that could be the only significance of agreeing not to seek a role enhancement under Chapter 3 was if they were eligible for safety valve. If they were not eligible for safety valve, there could be 17 enhancements, and it would not increase the sentence above 120 months. So that provision had meaning only in the context of safety valve. I understand that, but another way of thinking about the overall structure of this plea agreement is that the government was giving up all of the enhancements. I mean, the only fight in this case was either 120 months or less under safety valve. Correct, but there are five provisions under the safety valve. One, criminal history, no gun, role enhancement, and had to be honest in a debrief. And it was 120 months. But the government reserved the argument that the defendants don't meet the criteria for safety valve relief. And on its face, the criteria, not some of the criteria, the criteria. Well, correct. But the only way to give meaning to both provisions, that is to the provision that they waive Chapter 3 enhancements and to the provision that they can argue that they don't meet the criteria, is to say, okay, so you're agreeing that as to one of the criteria under the safety valve, we're not challenging that. So that gives meaning to the government's view, to the sentence that protects what the government wants, and it gives meaning to the sentence that protects what the defendant wants. There is to say- Can I just, sorry, just to be clear, we held that they were eligible for safety valve consideration in the prior case, but just to make sure I clarify, I understand exactly your response to one of Judge Katz's questions. And that is, once we got back, if you got through the entitlement, say you got through all the prongs on entitlement to safety valve, and so now you're going to argue it should be less, and the district court's going to look at the sentencing guidelines range. But your understanding of this plea agreement was, even if we were in that situation where we're now in full safety valve land, and we're arguing about whether we should go down, that the government was never going to pull out of its pocket this enhancement and say it should be more. It was that the sentence was absolutely capped at 120 months. The sentence was absolutely capped. The government never, never argued otherwise. And there was no use for this. And I think they said in their brief, they admitted in their brief that there was no use for this line about the government agrees not to seek any of the adjustments because it was a C plea. Right. Their brief argued that there was no point to the sentence under a C plea. Correct. It only had meaning in the context of safety valve. And to say, we're not going to do this for safety valve, but we're going to do it just, it would be an illusory promise. What exactly would they have given? And it certainly was not what the defendant understood. And the defendant's understanding is a reasonable understanding of these provisions and therefore to believe otherwise, or to rule otherwise, it just goes against contract law. Now I haven't even started my second argument. You can go ahead. You can take a few minutes on that. Go ahead. Thank you, Your Honor. So, as the court knows, there are few safeguards at sentencing for a defendant. While there have been cases that this court has decided that maybe you need, you need a burden above preponderance, it seems pretty clear that most courts do not require more than preponderance. But here you have out-of-court declarants, not confronted, criminals who have a lot to gain by reducing their sentence. They give the two... Mr. Hernandez, could you, I don't want to interrupt you, but I do, I guess. Yes, sir. Could you make your argument in terms of, not just that you think the district court's findings are wrong, but that they're clearly erroneous? They were clearly... That's what you have to say. Yes, sir. Tell us why they were clearly erroneous. Well, for two reasons. One, the way the hearing went forward is they allowed an agent who wasn't the case agent to summarize the testimony, ignoring all the contradictory statements. So that brought defect into the whole hearing. But more specifically, each... And there's a chart in my summary which shows it. So the government argues and the court found that my client was the logistics manager in charge of hiring the crews and paying the boat crews. We have five cooperators. They were all each crew members. Three of them were crew members on the Midsby, which is the case that we're involved in. And the other two were crew members on two other boats. And yet none of these five people had been hired or paid by my client. So on issue after issue where the court found my client did this, in fact, these five cooperators, the facts, the undisputed facts, contradicted what they claimed. And this court has not given a lot of procedural safeguards to findings by the district court. But when there are these internal inconsistencies between the allegations and the facts, this court has said, you cannot do this. You must go back and resolve these inconsistencies. As I say, there is a listing of all the things. They say he was in charge of the launch. He wasn't even present. At least one of the cooperators says he wasn't at the launch. One of the cooperators says he was. So that's an internal inconsistency. They say he played the role of being in between the owners of the drugs and the people on the boat. Yet there's not a single phone call between the owners of the boat, my client, and then that he then sends that information. And there's 100,000 phone calls in this case. 100,000. And they can't come up with one. There are so many inconsistencies in this case, Your Honor. They're all set out in the... Can I ask you about the gun possession? So the gun. Okay, so you have, and again, unfortunately you're up against a very onerous sort of standard of review. So tell me your best argument as to why it was clear error for the district court to credit the two witnesses that talked about one saw a gun and one saw a silhouette of a gun. So yes, silhouette is the agent's word, but in any event, both of these cooperators are interviewed approximately seven or eight times, each of them on separate occasions, starting days after they get arrested in 2012. It is not until 2016 that they first mentioned a gun. And they're inconsistent because Paredes, the captain, not only doesn't mention a gun until 2016, I believe that's his seventh interview, but then he says he saw this gun at a meeting. Now, for four interviews, he never even mentions my client being present at a meeting. And then all of a sudden it's at a meeting. Did he talk about meetings in those prior four interviews? Yes. From the start, he talks about meetings, they describe, and both of them, all of them, they describe the location of the meetings, the meetings are held at the home of the owner of the drugs. They place all of the defendants, all of the named defendants at these meetings, but not my client. And then all of a sudden... Had they been asked about a gun earlier as well, or was that not asked until a later date? Well, Your Honor, these processions are agents and the defendant and the defendant's lawyer. What's asked, we don't know because all we get is a summary on a 302. But if there's a gun, you would expect that that would have been brought up early on. And as I say, there are all these, not only does he not mention them, but in the first few, in the first, there are inconsistencies where in one place they will say, my client was a minor person or my client, the other brother was the one who gave instructions and all of a sudden they reverse course altogether. I mean, you were able to argue all these points about the belatedness of this information to the district court. If you had had a jury trial and argued these same issues to a jury, and the jury had found that there was a gun, I think you would agree we would not be able to overturn it on this record? Correct. So I didn't have the opportunity to confront these witnesses. What happened in this hearing, this is why the manner in which the information was introduced affected the whole hearing. There are eight interviews, say for one defendant, for one cooperator. He gives contradictory statements. And at no time is he confronted with his contradictory statements during the proffers. And at no time, when the law enforcement agent testifies at the evidentiary hearing, does he say, oh, he told us X, then he told us not X, then he told us Y. No. What the law enforcement officer did is he selected the one bit of information he wanted without acknowledging it. But you were able to ask Mr. Suchet questions about the information in the record that supports your client, correct? Right. And then the court ignores a lot of that. Even the court, like at one point... I'm just saying if a jury had come to the same conclusion with you asking the questions in front of, say, the same presentation, we would credit that. Is our standard for clear error in a district court finding a fact more probing than we would have a jury's resolution of a fact question, or is it essentially the same? Well, I would argue it's more, because at least the judge has to give their reasons why, whereas a jury just makes a finding. And there's no reason for you to defer to the district court. There's no demeanor judgment in this case. The judge didn't get to see these cooperators. And the judge did not explain why she was accepting this statement in contrast to that statement. The judge, in fact, at times... I thought she said she was accepting the things that were corroborated. No, she accepted things that were not corroborated. Well, just as to this gun. As to this gun, there were two people. There were two people. Supposedly, they were both at the same meetings. But yet one sees it at a meeting, the other one doesn't mention seeing it at the meeting. One says he saw him pull it out. The other one says he just saw it in, you know, he saw something under. And also, more importantly, even if you accept that, neither of them said that the gun was used in connection with the offense. So neither of them said he used the gun to intimidate the other people. He used the gun to safeguard the drugs. The legal finding that it was used in connection with was never addressed, or was not addressed adequately, I would argue, to the court. Thank you, Your Honor. Thank you for letting me go over. You're breaking up there. Okay, we'll hear from the government. Good morning. May it please the court, James Pierce of the United States. The district court did not clearly err in finding that defendant Moreno Mombache was not entitled to safety valve relief, both because he was a manager and supervisor, and because he possessed a gun. The court below also correctly concluded that the plea agreement did not preclude the government from making the manager-supervisor argument. So what is that sentence in paragraph nine of the plea agreement that is the lead-in sentence to what the defendants allowed to argue? The government agrees not to seek any of the adjustments set out in the USSG Chapter 3, Part B. You said in your brief, that was an empty phrase, because it was a C plea for 120 months. You were never going to be arguing for adjustments anyhow. So I just want to make sure I understand your position is that was sort of a throwaway line. And perhaps we should have been more precise. What we argued is that it was unnecessary, which was the same conclusion. Yeah, it was entirely unnecessary. Okay, so had no reason to seek, is what you say in your brief, and it was unnecessary. So that means, is there a difference between being unnecessary in the plea agreement and a throwaway? So I think the plea agreement on this point was not… Is there a difference between being unnecessary and a throwaway line in the plea agreement? I don't think that it is a throwaway. Well, if it's not a throwaway, it must be performing some function, but you told us it was unnecessary twice. So I think it is unnecessary, if I can just place it in the context of the full paragraph in which it appears. So it's a C plea. So the guidelines calculations are unnecessary. However, paragraph nine begins with the statement that recognizes, although it is a C plea, sentencing law requires that there be a guidelines calculation. So the following sentences, the following three sentences, the first one about criminal history, the next one about Smith departures, which have to do with a removable alien, and the third are all addressing guidelines issues that are, and we would concede, not necessary. Well, to be clear, it says that the pre-sentence report will include a calculation of the advisory guideline range. It's not talking about the government, what the government would be doing in that process. Well, I'm sorry, Judge Millett, you just broke up at the end. I apologize. What the prosecutors would be doing at the sentencing hearing is different from what your first line is about what the pre-sentence report would do. We're talking here about what the government was doing at the sentencing hearing. Yes, but the point is a sentencing hearing would nonetheless through a PSR and ultimately at the sentencing hearing would require a guidelines calculation, even if... Who does the guidelines calculation in a pre-sentence report? I thought that was the probation office. That's correct. The probation office does that independently. It hears from both parties. Okay, so when you say the government agrees not to seek any of the adjustments, that's separate from what the, I mean, the probation department could have said whatever it wanted in its pre-sentence report about whether it thought there was a managerial supervisory role, but this was a promise for, when I say the government, I'm assuming that means the prosecution, not to seek any of these adjustments. Indeed, and when the government made its sentencing submission, it said quite clearly when addressing the pre-sentence report, we agree that there are facts that support the determination that the defendant is a manager and supervisor, but consistent with the plea agreement and specifically paragraph nine, we are not advocating for any such adjustment. The point being that that advocacy as to the manager and supervisor applied not for a guidelines purpose, but as the final sentence in paragraph nine makes clear... Also... I'm sorry, go ahead. Just to contest the defendant's eligibility for safety vows. The difficulty is that to get the safety vows ineligibility on this ground, the prong force ineligibility, they have to qualify as a manager or supervisor, quote, as determined under the sentencing guidelines. And so you'd have to find and you'd have to advocate to argue ineligibility that under the sentencing guidelines, under USSG chapter three, part B, they are a manager or supervisor. And so you couldn't, consistent with that promise in paragraph nine, argue that they are ineligible under four. And it gets, I think, harder if we look at 5C1.2, which is a sentencing guideline that governs a safety vow. And it says to fall within that chapter for ineligibility, it must be a defendant who receives an adjustment for an aggravating role under 3B1.1. That's note five. And so I just don't understand how you can have that promise in the plea and yet still be allowed to argue that under that very sentencing guideline provision flagged in the plea agreement, they are a manager or supervisor, which is what you had to do under the sentencing guidelines. They had to receive that to be ineligible for the safety vow. That's my difficulty. And again, I'm sorry, Judge Millett, you cut out a couple of times, but I think I get the thrust of your question. No, I've had this problem. I think it may be on my end, even though I'm in the government office. So I apologize. Again, I think it is inelegantly drafted, but I do not think That is an understatement. I mean, excuse me, but we're talking about two sentences. I can't believe that the lawyers who negotiate these things can't come up with clear language that avoids these kinds of disputes. Inelegant is an understatement. In fact, doesn't that, in essence, kind of concede the point because under US v. Henry and other cases, if there's ambiguity in this, we construe it in the defendant's favor. So the next Half hour we've had here about debating what this means that Whatever this means it's at least ambiguous and therefore we should construe it in favor of the defendant. I do not think here that in elegance raises to the level of ambiguity. I think as the district court found below That final sentence makes quite clear that we are talking about two separate Analyses. One is enhancements for purposes of the guidelines and Judge Katz has talked about the potential exposure that a guidelines determination would subject the defendants here defendant Moreno Mombache to and the state. I'm sorry, can I ask you, follow up on that. I still don't understand that exposure. And in fact, I think your statement that it was an unnecessary. Sentence and the plea agreement says there is no exposure because you weren't going to argue it for the pre sentence report. You didn't And even if they had been able to argue to the district court depart. You know, we were all eligible for safety valve please depart. You wouldn't have been able to argue it there. Either. So I don't know how I'm back to. So I don't know how you can tell me in your brief, it's unnecessary. And then still tell me it was serving this function. In calculating the guidelines range. Again, I really am confused. So The The function of the sentence in in paragraph nine was addressing the guideline. Following sentence was addressed recognize that there is Under a simply not the need to address these guideline factors, but also it's not necessary to address the criminal history. It's not necessary to address whether the Smith departures, which, which is that the third sentence there. I'm sorry. No, it didn't say you don't address it. It says it's been factored in No, my point is not that the Smith factors haven't been addressed, there would be no no reason to have a sentence addressing the Smith factors at all. Under a simply because the guidelines determinations are ultimately unnecessary. But what that what the plea agreement does there is recognize a handful of things about the guidelines determinations that that ultimately are not relevant because this is a simply The criminal history is relevant. So you have to be category one to have safety valve. That's, that's true. Smith departures is not. And so I think the view there might have been kind of because that's sort of generally as I understand it. A downward adjustment in the Senate. I mean, this in a colloquial sense, not in a formal sense, a guideline sense, but because people when they Are here as immigrants will be deported at the end of all these fix these folks are brought in. They didn't come in. So I assume that's why that was there just as an assurance of the district court. And also, also, it might have meant that if they got safety valve and were able to argue to the district court, apart from mandatory minimum They wouldn't be able to say one reason to do so is the Smith rationale because that had already been Baked in and and it seems to me that there's still there's five different five different factors as to what it takes to qualify for safety valve and so you The play agreement when it says you could still argue eligibility certainly left you free to argue all the other grounds, including the the firearm ground that you did argue here. Right. It's true. I won't concede that it didn't allow us also the supervisor manager precisely because the language refers to all of the criteria. Does not meet the criteria. That's all five. It doesn't say excluding the supervisor manager piece of it, although judgment. I do think you touched on something important just in what you just mentioned, I recognize this is not helpful as Regarding the other defendant. This court were persuaded on the agreements that the plea agreement doesn't allow the government to argue Supervisor manager at all. That doesn't matter for Mr. Moreno mom botches case because the district court did not clearly air and finding that his gun possession. Was in connection with the offense. We've already mentioned that Luis Perez misbehave captain saw the defendant pull out a nine millimeter pistol at a misbehave planning meeting examine the magazine replace it in his You could clarify one thing I was a little confused about when Mr. Parade is a captain, Captain parties says he saw the gun pulled out and it was I thought the record said it was at a meeting that was somewhere near them is to be launch area, but I wasn't clear whether he had said it was at a misbehave Meeting the the guy who talked about the silhouette. I think said it was a misbehave meeting or near the misbehave. But am I wrong. Is there something the record, but I wasn't clear where Parade is saw this one. Where, what, where, when you saw this which meeting. Certainly. So my understanding of the record and just one record clarification point. Mr net is refers to a number of things like the various proper agreements, the district court commented below that those reports weren't Lodge. Many of them weren't fully lodged before the district court and a part of the record. And so the record that we're looking at a sushi's testimony. And that's the record that the district court and it's 38 page opinion ultimately relied upon. But to answer your question more directly for read this said he saw that at a misbehave planning meeting. Okay, I did not. I did not get get that. Do you have a site for that I just must have missed putting two, two and two together here. So I spent Searching around for that. I know he said he said at a meeting, we might have said near the launch site, but they may have launched other things from the site that may not mean a whole lot. So I have the 214 to 224 of the appendix. I don't have a more specific pin site which I certainly could get for the court, but my understanding of where the He saw the silhouette of the gun and that's indeed sushi's characterization at the misbehave launch site. So one is the misbehave planning meeting. That's what it is. The other is Campos, which says the launch site and those two facts also address the second piece of the gun analysis, which is Its connection to the offense. If you have a gun at the launch site or at the planning meeting of a go fast vessel, our position would be that is by its very nature facilitating the offense and all The festivals is to ensure the transportation of cocaine and in this case marijuana and the misbehave case from Columbia to Panama. So necessarily that gun is being used to facilitate the drug trafficking events. Um, do you have any further questions judgment. When, when, when you argue that he was responsible for moving drugs from different sites, you know, pre getting to the boat. Was there evidence that in that moving process. He was supervising people or he was just exercising sort of authority over the drugs. The, the statements from Paredes and Pozumino who was involved with the March 2012 go fast vessel and Jimmy Gonzalez, who is Miranda Mombache's cousin indicated that he was not only involved in specifically It was, you know, and Gonzalez hired I'm sorry. Could you come back that come back for you. Sorry. He was not only was where I last heard you. I'm so sorry. Frustrated by this connection, but that he hired and and supervised his two brothers. This is separate from Andres I believe their names were five air and maybe Renario or Mario. These were the ones who moved the drugs from Buenaventura to Choco Gonzalez specifically said hired and paid and Pozumino I don't necessarily I don't believe he said paid but certainly said supervised and was responsible for, of course. The Andres. The other brother, the brother who was apprehended on board the misbe in his first statement to law enforcement said that Moreno Mombache the defendant here had recruited him. Now, of course, Andres later recanted that a couple of months later, a recantation the district court found quote simply not credible and Andres also then went on to say Being the big brother, a supervisor. Is being a big brother, a supervisor. Supervisor manager. I mean, as a big brother myself. I might try to argue that Argument on which we're relying When it sounds like it was all younger brothers here that he was ordering around. Well, I don't think it was all younger brothers. It does sound as though he had a number of brothers, but It's clear again from from the phone call as well. There's a phone call between Moreno Mombache the defendant and his brother in which Moreno Mombache says One of these two brothers who context suggests have been apprehended by police needs to take the fall for this. Again, he's he's making managerial type decisions about this organization. And when we're here on a clear air standard This court does deference to the findings of the district court, not only the findings, but I think it's instructive in viewing the transcript below The district court was not judge how was not sort of passively just accepting all of the evidence. She was in fact quite active in interjecting and saying You know, I need more clarity from from sushi. You know, if this is just simply your speculative opinion. I'm not interested in it. If you are Telling me what the witnesses said that's fine. And that's reflected again in her 38 page opinion where she lays out that information which is corroborated By multiple of the cooperators involved here and then information that she finds either not particularly useful or otherwise uncorroborated and so As to both the manager director and the gun. We think there's no clear error. Okay, thank you. Thank you, Your Honor. Yeah. Miss Fernandez, you are out of time, but you can have a minute. Thank you, Your Honor, I have to correct the record. The government says that the gentleman who claimed that he saw the silhouette said that he saw it at the launch of the Mitzvah. That gentleman said that my client was not at the launch of the Mitzvah and his statement as to the silhouette does not refer to the launch of the of the of the Mitzvah. So if he says So he explicitly said my client was not at the launch of the Mitzvah These two other people were in jail in March of 2012 One of them gets arrested. My client had nothing to do with that boat. The government never alleged that that that With respect to Posnino that my client had anything to do with that. So whatever that person is saying about my client's role. He couldn't possibly have known he was in jail in March, the Mitzvah launches in June. The other defendant. Sorry, that's the guy who saw the silhouette was in jail at the time he saw the silhouette. No, no, no. The guy who saw the silhouette was one of the crew members on the Mitzvah. But he also claimed that my client was not at the launch of the Mitzvah. The government talks about two other That my client was transporting drugs. They were both in jail when the Mitzvah was going down and and they so they couldn't possible. I mean, they say a lot of stuff, but it's just With the courts indulgence. It's just garbage. The government, the, the evidence and the, as I said, the The gun, Your Honor. Two things on the gun. The one who says the silhouette did not identify when he saw it. And it was not at the launch of the Mitzvah because he claimed he was not he claimed that Moreno Minbachi was not at the launch of the Mitzvah. The other gentleman, Paredes, who claims that he saw my client pull out a gun during a meeting. Had on five previous occasions talked about meetings, the dates of the meetings, the locations of the meetings, the people present at the meetings and never identified my client as being at any of the meetings. So he just says at a meeting. He sees this and he says is four years and seven interviews into these things that makes no sense. These profit. The other thing is the government, the court gives credence the district court gives credence to what these guys say because they say they're making statements against penal interest. These statements are not against penal interest. They're testifying they're Providing profit set agreement pursuant to profit agreements. The other thing, the government just said the record. Excuse me, Mr. Hernandez. What did you just say, would you just repeat what you just said. Yes, sir. The district court gave credence among to what these cooperators Because she claimed they were making statements against penal interest when they admitted that they had like Paredes, who's been involved in, you know, since 1995 he's a former army. And why were they and why is she wrong about that. Because these statements made by these cooperators were being made after they pleaded guilty. Pursuant to guilty pursuant to proffer agreements in order to enter into plea agreements when you get proffer agreements. When you give proffers pursuant to proffer agreements, what you say cannot be used directly against you. And these are statements about things they did years ago in Columbia. It isn't like it isn't a local case where you can just add charges, but cooperators are never charged for additional statements they make So one last Finish your sentence and then we're done. Finish your sentence. One last statement the government made about the record being only the evidence at the hearing. I filed a post hearing memo, which is attached as In the sub seal supplemental joint appendix, which the court states it took into account in making its decision and that Post hearing memo includes a whole lot of references to different Statements from the record. And by the way, the government never sought to introduce any of these 302s. It wasn't that the defendants didn't introduce them. I was okay with the government with the introduction, the code defendants that he didn't want to, but the government never sought to introduce them so they can't stand here. Okay. Thank you. And thank you. Thank you. Thank you both very much. The case is submitted. Thank you.
judges: Tatel, Millett, Katsas